On behalf of the appellant, Ironshore Insurance Company, I present this argument beginning with the fact that this case arises from two accidental drownings occurring July 14, 2010 in Pella, Iowa. During the week of July 12, 2010, there were 177 campers who attended the Fellowship of Christian Athletes camp that was at Central College in Pella, Iowa. Two of the campers, Gail Crispin and Nameson Sannon, were the two boys who tragically drowned in the Pella Aquatic Center the third day of the camp. The two boys drowned on the evening of July 14, 2010. Now the two boys, there are some differences in their attendance at the camp. The camp was organized according to various sports. Gail Crispin was attending the camp as a basketball player, so he was in a group that was limited to basketball players. Sannon was a football player and attended the camp as a football player, was part of a group where everyone was a football player. Now as part of the supervision of all of the campers, the Fellowship of Christian Athletes appointed what they called huddle leaders to the various campers. Now in Gail Crispin's case, the huddle leader was Jason Anderson. And in Sannon's case, the huddle leader was Josh Sneller. So those were the two boys, I mean the two huddle leaders, that had general supervisory authority over the respective two individuals involved in this case. And what do huddle leaders do? The huddle leaders would be the first line of supervision. They're living there with the campers in the dorms. These would be older teenage boys that then keep track of the seven to ten campers within each of the huddle groups. The huddle groups are assigned numbers, and each huddle group then has a leader that's responsible for looking after and addressing the needs of the campers that make up that particular group. Now on the evening of July 14, 2010, all 177 campers were transported to the Pella Aquatic Center, which is the public pool in Pella, Iowa. And they arrived about 8.30. They had reserved this location, so the only people that were there at that time were the FCA campers. There were no members of the public that were there. There were lifeguards there. The huddle leaders were there. So the FCA had the pool to itself from 8.30 until 9.30 at night. Now no one knows when Gail Crispin drowned. No one knows when Nemsen Sannon drowned. What we do know is that at 9 o'clock, a 12-year-old observed the basketball player, who was Gail Crispin, struggling in the water. And the day after this happened, that 12-year-old gave a pretty compelling statement to the local sheriff's department, where he described seeing the basketball player struggling in the water, flapping his arms, and that he didn't think that he was pretending, that he thought he was in trouble. And he saw this individual go under the water and then pop back up for a breath, go back under the water again, and then he saw his body floating three feet below the surface of the water. Well, I'm just curious because I don't think what I read in the record didn't elaborate on the statement, but just did this witness explain why he didn't alert someone when he saw the child in trouble?  He went and told his mother, who was at the pool, and convinced him that what he saw was not a serious situation. Now, significant from the statement is there's no indication from this boy, and again, the boy doesn't definitively say he saw Crispin drown, but it sure, when you read the statement, it sure looks like this is a boy that probably did drown immediately after he was seen. And I think by preponderance of the evidence standard, you would think that that boy witnessed the drowning of one of these two people. He doesn't give any indication that the other boy that drowned was there at the same time dragging the other boy down, that they collided in the pool. So there's nothing to connect the drowning of Crispin with the drowning of Sanon. And in fact, it wasn't until 9.30 when they went to load up the buses that they realized these two boys were missing. And I guess tragically, the lights in the deep end of the pool were not working, and that caused the people that were there, because there's people looking for them, there's lifeguards looking for them, the huddle leaders are looking for them, but it took them 20 minutes to find the bodies of these two boys in the pool because of the darkened and murky conditions of the water. So, again, we're left not knowing, during that one-hour period of time, when did Crispin drown, when did Sanon drown. I think one point that's absolutely critical to the issue that's raised here, and that is that the pool party, what's described as the pool party, is not the occurrence. And I think that AXIS in the statements it makes in its brief, and on page 20 of its brief, it talks about a single, discrete pool party. And what it's trying to do is use language that is in cases about one occurrence versus two occurrence situations, and it's trying to describe the pool party as the occurrence. And how do we know that the pool party is not the occurrence? Well, we just have to look at the AXIS policy. And I'm quoting from page six of the AXIS brief, where they quote their policy, and they say, the AXIS policy defines occurrence as an accident, including continued or repeated exposure to substantially the same general harmful conditions. So the word accident is in the definition of occurrence in the AXIS policy that's at issue in this case. The pool party wasn't an accident. The pool party was a planned event. And while in our normal day-to-day conversations we might think of occurrences as being things like musical concerts or sporting events or a pool party, that's not what the policy says. The policy says that an occurrence is an accident. Now, the policy doesn't define accident, but the Missouri courts have defined accident. In a 2012 case from the Missouri Court of Appeals that I cite in our brief, on page 10 of our brief, Assurance Company of America v. Secure Insurance Company, the Missouri Court of Appeals defines accident as undesigned, unexpected event, an undesigned and unforeseen mishap resulting in an injury to or a person or damage to a thing, a casualty, as to die in an accident. So we see the word accident in the definition of occurrence, and then we see the word occurrence in the Missouri court's definition of accident. So what we have at the pool during the pool party are two accidents and two occurrences because the drowning of Sanon was not planned. It wasn't expected. It wasn't intended. It was accidental, as the coroner's report said and as everyone agrees. The drowning of Sanon was also an accidental drowning. Now, access relies primarily on two cases, the Kaling case, which involved a motor vehicle accident. And in the Kaling case, you had a motorist. The negligent motorist was trying to pass another motorist. And in attempting to pass, he struck a vehicle, an oncoming car. And then almost simultaneously, he struck the vehicle that he was passing. And under those facts, the Missouri court said, well, you've got two impacts that are occurring almost simultaneously. So in that case, we're going to treat that as one occurrence. But they established this time element and this space element, and the language that they used was almost simultaneous. Now, the other case that access relies on is a court of appeals case or, excuse me, an unpublished federal case from Missouri. The McBee case, which is a dog bite case. And in that case, we have one dog that escapes and bites two people that are jogging by at the same time. And in that case, the court said the accident was the escape of the dog. Different than the situation here. Here we have a situation where we have two different campers, neither one of which was part of the same huddle group. They were there attending the camp for different reasons. They sent in, they both sent in forms separately saying that they couldn't swim. So all the facts in this case suggest that we have two accidents and therefore two occurrences, albeit occurring within an hour of each other, but otherwise unsimilar and dissimilar in all significant ways. Now, the district court in its ruling said that there's really no cases, Missouri cases on point. And I think both AXIS and Ironshore have agreed with that. Despite the fact that the district court said that there are no cases on point, it didn't go outside of Missouri to try to find any similar cases. In our brief, we cite a number of similar cases in which boys died or boys drowned in circumstances similar to those circumstances at the Pella Aquatic Center in which courts held that there were two occurrences rather than one. There are a lot of cases, including federal appellate cases from the Fifth Circuit and the Seventh Circuit that we rely on heavily, in which under negligent supervision theories, which is what the theory is in the underlying case, and theories of negligent supervision cases where courts have found, even applying the cause analysis that AXIS wants its court to apply and that we agree should be applied, courts have found that there are situations where the same kind of negligent act can occur several times with separate injuries producing several occurrences. That's from a Seventh Circuit case, the Lee case. And I submit that that's exactly what we have here. We have similar negligent acts, negligent supervision by the FCA and its employees of two different boys, independent acts, independent duties, discrete acts leading to the same unfortunate and tragic result that just happened to happen within an hour of each other on the same evening at the Pella Aquatic Center. If I may, could I reserve the remainder of my time for rebuttal? Thank you. You may proceed, sir. May it please the Court. And you are Mr.? Christopher Havilianar on behalf of Fellowship of Christian Athletes. Your Honors, I'll be brief. The Fellowship of Christian Athletes continues to take no position as to whether the issue before the court constitutes one occurrence or two occurrences. Indeed, we'll leave that up to our insurers and their counsel to argue those positions on behalf of their respective clients. We do believe that the district court was correct in as much as it determined that the issue was ripe for determination by the court and, in fact, did so in its brief. With that, if it pleases the Court, I'll defer the remaining amount of my time to Ms. Wexelman on behalf of Access Insurance to argue her position. Very well. Good morning, Your Honors. Good morning. You may proceed. If it pleases the Court, my name is John Hebb. I represent RSUI Indemnity Company, a defendant appellee. RSUI provides a third layer of coverage. Below it are the access policy and the iron shore policy. The RSUI policy does not come into play until the full limits of the underlying two policies are exhausted. No one disputes that fact in the case, and consequently, as with the FCA, our client takes no position on whether this tragic accident is a result of one or two separate occurrences. Obviously, we would defer to the ruling of the court in that regard. Unless the court has further questions, that's all I have to say. What's an occurrence? It's defined by the policies. I think the definition is an accident arising out of ‑‑I would just have to go to the policies, because, you know, the policies have, I think, essentially the same definitions, but I defer to the other counsel on that point in terms of the actual. You don't have one. I have a definition in my policy. An accident including repeated exposure to the same general occurrences. So, again, we defer to the court's decision. Thanks very much, Your Honors. Thank you very much. Good morning. You may proceed. Good morning, Your Honors. My name is Lisa Wexelman, and I'm the attorney for Access Insurance Company. I apologize out of the box. I have very, very bad allergies. So if you have trouble hearing me, please let me know, and I'll try to speak up. This morning I'd like to address basically two points in some detail. Before I do that, though, I'd like to respond to something that was addressed earlier. In the remarks of counsel for Ironshore this morning, you heard a lot of purported facts. Those are facts that I think if you review the record, you will see they're not in the record. And this leads me to point out to the court that this case came to the court on a very what I'll call abbreviated basis. The underlying case is still pending in Iowa State Court, and, in fact, the case is now on appeal on an issue unrelated to the issues that were here today as it relates to sovereign immunity for the city of Pella. So there has been virtually no discovery done in that case. There's very little record from that case. And a lot of the information that was being imparted to you by Mr. Jones today is information that came from various documents, which may or may not ultimately be evidence in a case should those evidentiary issues be raised or those factual issues. One of the questions, and specifically the question was, well, what do huddle group leaders do? And that's one question that I think if there were a fuller factual determination, there would be a significant amount of discovery as to what the huddle group leaders' responsibilities were on the date of these tragic drownings. Those are questions of fact that we don't think are properly before the court at this moment in time. When will that happen, if at all? We believe the record was sufficient for Judge Whipple at the district court level to determine that there was one occurrence under the policy, which he did so based on the facts that were stipulated to and not in controversy. If for some reason this court is to determine that there is a more significant factual level of inquiry required, for instance, if you believe that the issue is one that's almost simultaneous, which is the issue that was raised in the brief for Ironshore, or if you believe that the events immediately preceding the drownings of the two boys are relevant to a determination of cause, then in all likelihood those issues would be determined through fuller factual determinations at the trial court level. Well, in a quick summary, it appears to me that you had two beating hearts here by two different boys in the pool, and one on its own drowned, unrelated, another one drowned, and is there any connection between the two to kind of compact this into, what do you call it in the insurance industry, something like simultaneous? Yeah. What's the difference between these two people could have been in two pools in different parts of Iowa? Would you also put that together and say it can't be happening? Certainly not. Not two pools in two different places in two different situations. But this goes back to exactly what is my point. There's not been a development of a factual record. I can't, as I stand here today, tell you when the boys drowned, what each boy was doing as they drowned. That is all issues that would be developed further in factual discovery either in the underlying case or in the trial court level of this case were those issues to be perceived. My point in saying all of this is that Judge Whipple found, as Axis argued, that those kinds of fact issues are critical to the determination of whether there is one occurrence under the insurance policy. The trial court was not required to find that the two boys died simultaneously in order to find one occurrence. The cause for purposes of the occurrence analysis is a series of related acts which began when the FCA, the Fellowship of Christian Athletes, sent the boys to the pool party knowing that they couldn't swim and without any measures to assure their safety. And because the boys drowned as a result of the exposure to substantially the same conditions, it's one occurrence under the policy. The critical language of the policy, and there was some discussion of that, but when you look at the language of the policy, the policy specifically provides a definition of occurrence. And that definition is an accident including continuous or repeated exposure to substantially the same general harmful conditions. Judge Whipple found that the boys died as a result of exposure to the same general harmful conditions, and that was the basis of his one occurrence ruling. Well, this decision by the district court is based on the allegations of the complaint and the language of the policy. Would you agree with that? At this point, the factual development really is irrelevant. We're looking at what the allegation of the complaint is, what the cause of the approximate cause of these deaths as alleged in the complaint. I would agree with that, Your Honor. I think there are certain facts that were stipulated by and between the parties, which may not be specifically alleged in the underlying complaint. Those facts are part of the record. But basically, the issue before the court is the cause of action that's being asserted or the claim that's being asserted in the underlying cause of action. In that regard, the underlying complaint, basically I think it's important to think about what was alleged there. The plaintiffs, as noted by Mr. Jones, each signed FCA participation forms for both boys, indicating that they couldn't swim. FCA allowed the boys to enter the aquatic center and did not take any action to prevent the boys from entering the water or other precautions for their safety. That's the critical allegation in the underlying complaint. There's one count of negligence against the FCA, and it alleges that the FCA was negligent by allowing the boys to enter the aquatic center after parents signed permission forms indicating the boys could not swim, by allowing the boys to enter the aquatic center unsupervised, knowing they were unable to swim, by failing to properly train and supervise the camp counselors, and by taking the boys from the camp to the pool when they were unable to swim. Now, I've already pointed out the access policy provision about the definition of occurrence. The access policy goes beyond just defining the occurrence. The policy then provides that each occurrence limit is the most it will pay for all damages arising out of any one occurrence, regardless of the number of insureds, the number of claims made, or the persons making the claims. So when you read those policy provisions in conjunction, that gives you the basis for finding that this event, this loss, constitutes one occurrence. The focus isn't on the term accident. The focus in the causation test that's been adopted in Missouri and applied in Missouri is on the conduct of the insured. Here, the insured is the Fellowship of Christian Athletes. I want to talk about that a little bit more, but before I do, a couple of things I'd like to just point out that I think should be clear to the court. Ironshore does agree that Missouri law controls the interpretation of the access policy provisions. It does not argue that the policy is ambiguous. It does not dispute that other general liability policies containing virtually identical language to that contained in the access policy have been interpreted to provide a one-occurrence limit for all claims caused by the same occurrence. Ironshore also agrees that Missouri employs the cause test in determining whether there is one occurrence under the policy. Ironshore, however, in its brief and before this court, would have the court engraft a time and space requirement that the drownings had to occur almost simultaneously. That's their whole argument here, is that because at this point in time, we don't know exactly when those boys died, that we can't meet that almost simultaneous test. In response to that, if you look at the cause test, the general rule that relates to the cause test is that where there's a series of related acts of negligence and those acts result in injury, those acts are considered a single occurrence for the purpose of determining coverage limits under an insurance policy. The accident isn't the pool party. The issue in this case is the cause, the negligent conduct. And here, the cause is the FCA, while knowing that the boys could not swim, sent them to a pool party and they did not take precautions. And this is what's alleged, I must say, is what is alleged in the underlying complaint. But they sent them to that pool party knowing they couldn't swim and without additional precautions for their safety. They drowned. There are basically three cases that are described in the briefs, and those three cases are a killing that Mr. Jones referred to, McBee, and another case called Hollers v. Wyatt. None of those cases have held that multiple accidents must occur simultaneous in order for there to be one occurrence. Instead, what Ironshore has done is that because the court in Killing discussed a case called Liberty Mutual v. Rawls, and in that case the court adopted the almost simultaneous test as part of its analysis and the claimants argued that case in Rawls, the court distinguished it. But it didn't adopt it as the law of Missouri. Instead, what it did was it followed a decision from a Virginia court that adopted the simple cause approach. The Ironshore brief also ignores what is a very, very detailed and well-reasoned analysis by Judge Sachs in the McBee case. Which case was that? McBee. Okay. When you look at McBee, what he did then is he specifically looked at the issues of the case, and he said that in keeping with the cause approach as illustrated in Hollers and Killing, the injuries sustained by each of the McBees were the result of continuous exposure to substantially the same harmful conditions. Here we had continuous exposure of these two boys to substantially the same harmful conditions. There were no differences. There's a lot of issues made about the responsibility of the camp counselors, but there's no evidence in the record that either of the camp counselors had any different responsibilities than any of the 21 camp counselors that attended that pool. There's no evidence that these two camp counselors had specific responsibilities with regard to the boys while they were at the pool. Those are all issues that, if that becomes the test, requires the case to be remanded. I see that I'm out of time. I will submit to you that the facts in the case are sufficient, using the cause approach adopted by the Missouri courts to sustain the ruling of Judge Whipple, that it was one occurrence under the policy. In the event that the court finds that there is a more detailed inquiry as to the simultaneousness of the events or the events immediately preceding the accident, then the case should be remanded for additional proceedings. Thank you. Mr. Jones? Thank you, Your Honor. I take umbrage with counsel's suggestion that I'm making up facts. I would say that all of the facts in my statement of undisputed facts contain citations to specific parts of the record, and I would encourage anyone that has a question about that to look at the parts of the record that are included in an appendix that fills up two volumes because it's so big. Now, Access may not have done any discovery in this case. It may have relied on the fact that it could go back and do discovery at some later date, but I did. I sent out interrogatories. I sent out requests for admissions, and in the addendum that I put in this case, I use the responses to requests for admissions by both Access and Fellowship of Christian Athletes. I put in interrogatory answers from Access, including the answer to Interrogatory 8, in which they said, as it understands the phrase, Access is not claiming that Gail Crispin and Nemson Salmon drowned simultaneously. And so now they want to go back and say, well, we want to do some more discovery to figure out if they did drown simultaneously. They've had that chance. I filed a motion for summary judgment. They didn't ask for additional time to do depositions or to do discovery. The record is there. And I believe that the record clearly shows that what we have here are two accidents. We have an underlying case, an underlying case where the claim is negligent supervision. Now, when I filed my brief, my Eighth Circuit brief, Access filed their brief, and they said, well, this isn't really, the underlying case isn't really a negligent supervision case. And in my reply brief, I cite three or four, I quote three or four places in the record where Access has made statements in its pleadings in this case that describes this as a negligent supervision case. I'm not just making the simultaneous accident argument. That's issue number one. That shows that we have two accidents here that are, in fact, two accidents. I also make the argument that we have different levels of supervision. We have negligent supervision claims. We have different chains of command for these two boys, as I've said before. This Haller case that I didn't talk about before, the Haller case involves two people on a motorcycle that were involved in one motor vehicle accident. They got hit by a car. And the passenger tries to make a separate claim from the driver of the motorcycle, and the court said, no, that's one accident. That was the right decision there. It has no bearing, no relevance to this case. I see that my time is up, and so I would thank you. Well, we thank all counsel for their arguments and presentations. The case is submitted, and we will take it under consideration. We will be in recess for about 10 or 12 minutes before we go to the last case of the morning.